WILLIAM FOLEY (PLAINTIFF), APPELLANT, v. UNION HOUSE FURNISH-
ING COMPANY, A CORPORATION (DEFENDANT), RESPONDENT.—60
S. W. (2d) 725.

St. Louis Court of Appeals.   Opinion filed May 31, 1933.

Motion for rehearing denied June 13, 1933.

Certiorari denied by Supreme Court July 20, 1933.

1064

*Douglas H. Jones* for appellant.

*Stern & Burnett, B. L. Liberman* and *Robert L. Aronson* for respondent.

BENNICK, C.—This is an action for damages for wrongful and malicious garnishment. Tried to a jury, a verdict was returned in favor of plaintiff, and against defendant, for $2,350 actual damages and $850 punitive damages, or for the total sum of $3,200. Thereafter defendant's motion for a new trial was sustained upon two assigned grounds of the motion; and from the order so entered, plaintiff has duly appealed.

Plaintiff, by trade, is a maintenance man, experienced in the work of taking care of motors and pipe lines and of setting up motors for operating machinery. In 1925, after eleven and a half years' service with the Union Electric Light & Power Company, he left that company's employment, and secured a similar position with the John Nooter Boiler Works Company, at 1401 South Second Street in the City of St. Louis. The record affirmatively shows no more than that his connections with the latter company were severed in the late spring of 1930, but plaintiff's offer of proof, after objection to the evidence was sustained, was that he was discharged, according to a fixed rule of the company, because the garnishment in question was run against him.

But to get at the case in its chronological order, it appears that in October, 1925, plaintiff and his divorced wife, Irene B. Foley, who were contemplating a reconciliation, went to defendant's furniture store to look at some kitchen cabinets. They found one cabinet that they liked rather well, but it was not purchased, no deposit was made upon it, it was not put away for plaintiff's account, no credit reference was given, and no chattel mortgage was signed. When cross-examined about all these matters, plaintiff's answers were positive, as was also his testimony that he had never purchased any merchandise from defendant.

Some months later it seems that the former Mrs. Foley bought a trunk from defendant and had it delivered to her at her address on Hortense Place, where she received for it as "Mrs. William Foley," though her name at that time was "Ryan." Apparently when her reconciliation with plaintiff had failed, she had married for the second time. But though the trunk was delivered to plaintiff's ex-wife on Hortense Place, it was charged to the account of plaintiff at 913a Montgomery Street, where he had been living at the time of his visit to defendant's store.

The account as originally opened was for $25.50, the purchase price of the trunk, but by subsequent installment payments the balance due was reduced to $13.50.

The first information plaintiff had of the matter was on November 28, 1928, when he received a letter from defendant, asking him to remit the balance of $13.50 due on the account,. and warning him that upon his failure to remit, the matter would be turned over to the proper authorities. Upon receipt of such letter, plaintiff called at defendant's store and had an interview with the writer of the letter, explaining the separation between himself and his divorced wife, and stating generally the reasons why he was not liable on the account. On the occasion of this visit he was treated very courteously by defendant's representative, who, after a cursory examination which included an inspection of the company's records, accepted plaintiff's explanation of the transaction and assured him that he would not be bothered again.

A few months elapsed, when plaintiff received a second letter from defendant, of much the same tenor as the first, advising that he should come down to defendant's place of business and avoid further trouble. In compliance with the demand, plaintiff again called at defendant's store, where he was treated very discourteously by the one to whom he was referred on this occasion. Plaintiff had neglected to bring his letter with him, and defendant's representative refused to go into the company's files for the carbon copy, but abruptly told plaintiff to come back and bring his letter with him if he wanted to get any further satisfaction.

The next plaintiff heard of the matter was when he was summoned to appear in the justice's court on July 23, 1929, to answer to the suit on the account which defendant had meanwhile filed against him. On the return day plaintiff appeared in the justice's court; and when his name was called he stepped forward and explained the whole situation to the justice in the presence of defendant's attorney. At the conclusion of the examination, which included the submission of his decree of divorce, the justice, with the acquiescence of defendant's attorney, dismissed the case and so noted on the files.

Later plaintiff received a third letter from defendant, stating that

if he did not pay his account, action would be taken against him; and upon the receipt of such letter plaintiff went back to the justice's court and requested the assistance of the justice. The latter thereupon prepared and gave plaintiff a letter addressed to Mr. Yedelin, defendant's credit manager, in which the justice advised defendant, in effect, that the case had been dismissed and the order of dismissal entered in agreement with defendant's attorney.

Upon being given the letter by the justice, which was on October 14, 1929, plaintiff again went to defendant's store to see Mr. Yedelin, but not finding him in was referred to some one else in the credit department. Plaintiff read the justice's letter to defendant's representative, whereupon the latter got out the company's files and told plaintiff that the company had a judgment against him, and intended to sue out a garnishment to collect the judgment debt of $13.50.

As a matter of fact, on April 23, 1930, an execution and garnishment was requested by defendant, plaintiff's employer, the John Nooter Boiler Works Company, being named as garnishee. The clerk of the justice's court testified that he issued the garnishment at defendant's request without examining the record for himself to determine if a judgment had been entered, merely assuming in the rush of business that a garnishment would not be requested without a judgment upon which to base it. Summons to garnishee was served upon plaintiff's employer, returnable May 6, 1930.

After the garnishment papers had been made out, the clerk later in the day prepared to make the entry in his docket, when he discovered that the action on the account had been dismissed and no judgment entered. He thereupon telephoned defendant of the error in the issuance and service of the garnishment, and was told by defendant to release the same, whereupon he prepared a notice of release and mailed it to the garnishee. From the issuance of the summons until the giving of the release, only two or three days elapsed; and of course no answer had meanwhile been filed by the garnishee.

Plaintiff testified that while at his employer's plant on a Thursday, he was told by his foreman at noontime, in the presence of from twenty to forty other employees, that his wages had been garnished; that the foreman "wanted to know why in the hell I didn't pay my bills;" that he attempted to explain that he didn't owe the debt, but was told that he must have owed it else the garnishment would not have been run against him; and that he was very much humiliated to have had that experience. He thereupon employed an attorney who at once took charge of the situation for him, and on the following Saturday, which was pay day, he received his wages shortly after the other employees had been paid.

After stating the general purport of the facts as they have heretofore appeared, plaintiff's petition alleged as follows:

"Plaintiff further states that by reason of said unlawful acts of the defendant he was caused to suffer and lose his position with said boiler company, and by reason of such acts was exposed to the ridicule and contempt of the general public; that plaintiff was caused to suffer the loss of time and wages from his employment by reason of said wrongful garnishment; that he was disgraced and humiliated among his friends, acquaintances, and neighbors; that he has been brought into disrepute and disgraced thereby; that all of said acts were wrongful and without warrant of law; that by reason thereof he has been caused to suffer actual damages in the sum of $3,750.

"Plaintiff further states that all of the above and foregoing acts of defendant were willful, malicious, and wanton, entitling plaintiff to punitive damages in the sum of $3,750."

The answer of defendant was a general denial.

Defendant stood upon its demurrer to plaintiff's case; and the verdict for plaintiff, the grant of a new trial, and plaintiff's appeal to this court all followed as has been heretofore indicated.

The real basis for the grant of a new trial, according to the memorandum filed by the lower court in connection with the entry of its order, was that error had been committed in the giving of plaintiff's Instruction No. 1 upon the measure of damages, in so far as that instruction directed the jury, upon a finding for plaintiff, to take into consideration and compensate him for "such shame and humiliation, if any, that you may find and believe from the evidence plaintiff suffered by reason of the acts of the defendant, if any, mentioned in evidence."

In other words, the point in controversy is whether shame and humiliation are proper items of damage in an action of this character, plaintiff arguing that they are where attended by willful, oppressive, and malicious conduct, and defendant seeking to uphold the action of the court by asserting the negative of the proposition.

So far as the authority at large is concerned, the cases are much in conflict, some jurisdictions holding that the matter of injury to the feelings and the like is too remote to be considered, while other jurisdictions hold that an allowance may properly be made for injury to feelings if the garnishment or attachment was sued out maliciously and without probable cause. [6 C. J. 541; 2 R. C. L., sec. 122, pp. 909-911.]

Fortunately, however, our own Supreme Court has spoken, and has held in Walser v. Thies, 56 Mo. 89, 93, that "the rules as to damages, applicable in cases of malicious prosecution, apply to actions for malicious attachment." And this is as it should be, since a "wrongful garnishment gives rise to a cause of action for malicious prosecution where the elements of malice and want of probable cause are present." [28 C. J. 542; 38 C. J. 391.] Continuing in Walser v. Thies, supra, the court proceeds to quote from a standard

text-writer to show that in actions for malicious prosecution, even of civil proceedings, the plaintiff is entitled to indemnity "for the injury to his reputation, his feelings and his person." This is the rule which has been consistently followed by our courts in determining the elements of compensation. [Ahern v. Collins, 39 Mo. 145; Randol v. Kline's, Inc. (Mo.), 49 S. W. (2d) 112; Ruth v. St. Louis Transit Co., 98 Mo. App. 1, 71 S. W. 1055.] Of course the usual case for the allowance of such damages is one where the plaintiff had been subjected to a criminal charge, but the nature of the charge maliciously and wrongfully prosecuted should go only to the extent of such damages and the reasonable probability that they would have been sustained, and should therefore include a civil proceeding of the character of the one now complained of where its nature is naturally such as to bring humiliation and to injure reputation or credit.

So we conclude that from the standpoint of legal theory the inclusion in the instruction of the elements of shame and humiliation was not improper. But defendant argues that in this instance they were in all events improper, since in the instant case, if plaintiff suffered shame and humiliation, it resulted from the independent and intervening act of a third person. In other words, defendant's position is that the humiliation came from plaintiff's being asked by his foreman, in the presence and hearing of numerous of his fellow-employees, "why in hell he didn't pay his debts;" that such a public announcement of the fact of the garnishment was not reasonably to be anticipated; and that consequently, the humiliation suffered by plaintiff may not be said to have flowed directly from the garnishment, and is too remote to be considered.

It must be borne in mind, however, that in cases of affirmative wrong, damages are not remote, as distinguished from proximate, if they are directly traceable to the wrongful act of the wrongdoer. [Bouillon v. Laclede Gas Light Co., 148 Mo. App. 462, 129 S. W. 401.] Here it was at least reasonably to be expected that when plaintiff's money was attached in his employer's hands, he would be notified of the fact, though it is undoubtedly true that defendant could not foretell the exact manner of notification. But conceding this fact, defendant is nevertheless to be held liable for all injuries directly resulting from its wrongful act, whether or not they could have been foreseen, if, after the injury is complete, the same appears to have been a natural and probable consequence of its wrong. In this case we think the chain of causation was complete. The wrongful garnishment necessarily called for notification to plaintiff. He might have been called into the office privately, where his humiliation would have been less public, but it would also have been logical to assume that he might have been notified as he in fact was, out in the plant, among his fellow-employees, at the very place where his duties required him to be.

So the humiliation from the foreman's caustic comment was not without its causal connection. But aside from this, the officers and office employees of the employer would necessarily have learned of the garnishment, and their knowledge that plaintiff had refused to pay his debt would likewise have caused him humiliation. Consequently, there was ample evidence to have warranted the inclusion of such element of damage in the instruction, and the grant of the new trial upon that ground may not be upheld.

The other ground assigned by the lower court for granting the new trial was that it had erred in admitting the testimony in regard to the manner and circumstances under which the foreman notified plaintiff of the running of the garnishment. What we have already said disposes of the objection to the competency of this testimony, and it is enough now to say that the sustaining of the motion upon that ground was unwarranted.

But defendant argues (and correctly so), that the issues on this appeal are not restricted to the mere grounds upon which the court sustained its motion, but that it may assume the burden of insisting that other grounds of the motion, though presumably correctly overruled by the court, were in fact well-founded, and might have served as the basis for the order which was entered. [Smith v. Kansas City Public Service Co., 328 Mo. 979, 43 S. W. (2d) 548; Yuronis v. Wells, 322 Mo. 1039, 17 S. W. (2d) 518; Manthey v. Kellerman Contracting Co., 311 Mo. 147, 277 S. W. 927; Noren v. American School of Osteopathy, 223 Mo. App. 278, 2 S. W. (2d) 215.]

The first of the points so relied upon is that it was error to admit in evidence the letter given plaintiff by the justice of the peace, which was addressed to defendant's credit manager, and which was taken by plaintiff to defendant's store and read by him to the one to whom he was referred. The justice testified that in view of the time that had elapsed since the case had been called in his court and the hundreds of cases that had come before him, he had no independent recollection of the transaction, but he did identify the letter as his own and as undoubtedly being a truthful recitation of the facts appearing therein.

The objections leveled at the admissibility of the letter are that it was but a self-serving statement by plaintiff, showing on its face that it was based wholly upon the representations of plaintiff to the justice, and that its verity was not vouched for by the justice because of his lack of all independent recollection of the subject-matter covered by it.

In view of the identification of the letter by the justice and the further proof that it was read to defendant's representative, we think none of the above objections are well taken. But there is a very special reason why the introduction of the letter was not prejudicial to defendant's rights. The only purpose which the letter purported

to serve was to advise defendant that its action against plaintiff had been dismissed. The fact of dismissal stands conceded. Therefore, if there had otherwise been error in the admission of the letter, it would clearly have been harmless and wholly insufficient as a ground upon which to base the granting of a new trial. [Hartpence v. Rodgers, 143 Mo. 623, 631, 45 S. W. 650; Potter v. Whitten, 170 Mo. App. 108, 124, 155 S. W. 80; Thompson v. A. Morgan Hauling & Express Co. (Mo. App.), 26 S. W. (2d) 807; Kelso v. Lincoln National Life Ins. Co. (Mo. App.), 51 S. W. (2d) 203; Proctor v. Sutherland, 162 Mo. App. 641, 649, 148 S. W. 127.]

But another point is raised which presents a far more serious aspect so far as concerns defendant's right to claim prejudice in connection with it.

In the course of plaintiff's direct examination, he was asked what time he had lost in making the several trips called for by the controversy, and he testified to the loss of $12 in wages, representing two days' labor, one day having been lost when he went to the justice's court to answer to the action on the account, and the second day when he went back to the court to get the letter from the justice. Such testimony was objected to by defendant upon the ground that such an item of damage was not embraced by the pleadings, and that objection should have been sustained because as the petition then stood there is now no pretense that it pleaded such special damages.

The objection was overruled, however, but at the close of the whole case, during a recess of the court, plaintiff amended his petition, inserting the clause "that plaintiff was caused to suffer the loss of time and wages from his employment by reason of said wrongful garnishment." In other words, recognizing the insufficiency of his petition, plaintiff was endeavoring to amend the same to conform to the proof, and thus to obviate the error in having admitted such proof over defendant's objection.

Conceding that the amendment may have been one within the discretion of the trial court to have allowed, though defendant strenuously resists this conclusion, the trouble is that the amendment did not cure the error, since it did not purport to embrace the loss of time and wages occasioned by defendant's conduct, but only the loss suffered "by reason of said wrongful garnishment."

The allegation itself was well enough, for the loss for which plaintiff was entitled to be compensated was that entailed by and incurred in his resisting the garnishment. [Helfer v. Hamburg Quarry Co., 208 Mo. App. 58, 233 S. W. 275; Fry v. Estes, 52 Mo. App. 1; State to use v. Larabie, 25 Mo. App. 208; 6 C. J. 543.] Here, however, the item proved went to loss incurred long prior to the institution of the garnishment, and was therefore not recoverable either as a matter of law or under the amended petition.

1072

Counsel for plaintiff apparently realizes the weakness of his position, because in his reply brief, where he attempts to justify the competency of the proof in question, he refers us to the amendment and purports to set it out, but studiously avoids quoting the phrase "by reason of said wrongful garnishment."

The error cannot be regarded as a mere trivial excess under the maxim "*de minimis non curat lex*," especially in view of our precedents, defendant's strenuous assertion of no loss established by reason of the garnishment, and its even more strenuous assertion of the excessiveness of the verdict which discloses that the jury must have allowed some $2,238 as actual damages for plaintiff's shame and humiliation. Nor can we cure the error by a *remittitur*, our power and authority on the appeal from the order granting a new trial being limited to sustaining the order of else reinstating the verdict and judgment as rendered. [Gaty v. United Railways Co., 286 Mo. 503, 227 S. W. 1041; Grzeskoviak v. Union Electric Light & Power Co., 299 Mo. 116, 252 S. W. 364; Ostrander v. Messmer, 315 Mo. 1165, 289 S. W. 609.]

It follows that upon the ground noted, the order of the circuit court sustaining defendant's motion for a new trial should be affirmed, and the cause remanded. The Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed, and the cause remanded. *Becker, P. J.,* and *Kane* and *McCullen, JJ.,* concur.